**Affirmed and Opinion filed December 31, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-01075-CV

**MYRA LISA WELLONS, INDIVIDUALLY AND AS THE REPRESENTATIVE OF THE ESTATE OF JASON WELLONS, DECEASED, AND MEGAN WELLONS, Appellants**

**V.**

**VALERO REFINING—NEW ORLEANS, L.L.C., Appellee**

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2015-36186**

## O P I N I O N

This case involves a conflict-of-laws dispute in a wrongful death action where the decedent, Jason Wellons, was covered by workers' compensation insurance. Appellants Myra Lisa Wellons, Jason's widow, and Megan Wellons, Jason's daughter, appeal from the trial court's determination that Louisiana law should apply to the claims against appellee Valero Refining—New Orleans, L.L.C. ("VRNO") and from the court's final take-nothing judgment favoring VRNO.

Jason's injuries occurred at VRNO's refinery in St. Charles Parrish, Louisiana, and he later died in St. Charles Parish. However, Jason was domiciled and hired in Texas, and appellants received Texas workers' compensation benefits.

In addition to asserting that the trial court erred in applying Louisiana law, appellants also assert that the trial court erred in prohibiting one of their expert witnesses from testifying as to the intent of VRNO's personnel and that VRNO's counsel made incurably improper statements during closing argument. We affirm.

## *Background*

Jason was hired by J.V. Industrial Companies, Ltd. ("JVIC"), a Texas corporation, to work a turnaround at VRNO's St. Charles Refinery in Norco, Louisiana. Jason was a Texas resident and was hired in Texas but specifically for the turnaround in Louisiana.

On March 17, 2015, Jason was working on a pipe rack at the refinery approximately 30 feet above the ground while wearing an impermeable chemical suit with the wrists and ankles taped. When Jason became overheated and collapsed, VRNO emergency personnel responded to the situation. Jason was lowered from the pipe rack and taken to a local hospital, where he died the next day. An autopsy concluded that Jason died as the result of heatstroke. Appellants contend that the delays in responding to the situation and failure to timely and properly treat Jason's condition, including failing to quickly lower his body temperature, led to his death. VRNO asserts that its personnel worked as quickly and efficiently as possible under difficult circumstances. After Jason's death, appellants received Texas workers' compensation survivor benefits with JVIC listed as the insured employer on the claim documents.

Appellants sued VRNO, JVIC, Valero Services, Inc., and several other

defendants in a Texas court, bringing a wrongful-death action and alleging negligence and gross negligence. By the time the case reached the jury, only VRNO remained as a defendant. After extensive briefing and argument by the parties, the trial court determined that the claims against VRNO should be determined under the substantive laws of Louisiana—which permit recovery for wrongful death when a decedent is covered by workers' compensation only when the defendant committed intentional conduct—and not the substantive laws of Texas, which permit recovery of exemplary damages in such cases for gross negligence.

During trial, after an objection by VRNO, the trial judge ruled that one of appellants' expert witnesses, Dr. John McManus, would not be permitted to testify regarding the subjective intent of VRNO or its employees. During closing argument, VRNO's counsel made arguments concerning the fact appellants had to prove intentional conduct. At one point, appellants' counsel tried to object to the argument, but the trial judge overruled the objection and told counsel to sit down.

Question no. 1 in the jury charge asked:

> Did the intentional conduct, if any, of Valero Refining—New Orleans, LLC proximately cause Jason Wellons' death?

> In considering the conduct of Valero Refining—New Orleans, LLC, consider only Valero Refining-New Orleans, LLC 's, conduct dealing with the rescue and providing emergency medical care after Mr[.] Wellons' injury became known.

> "Intentional conduct" means that one or more Valero Refining—New Orleans, LLC employee either (1) consciously desired the physical result of his actions or (2) knew that the result is substantially certain to follow from his actions. If a Valero Refining—New Orleans, LLC employee knew that the consequences are certain, or substantially certain, to result from his actions, and still goes [sic] ahead, it is treated by the law as if Valero had in fact desired to produce the result.

3

> "Substantially certain" means virtually sure, inevitable and incapable of failing.

> "Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred[.] In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

On a 10-2 vote, the jury found that the intentional conduct of VRNO's employees did not proximately cause Jason's death. Because of that answer, the jury was not required to and did not answer any other questions.

## *Discussion*

### I. Conflict of Laws

In their first issue, appellants contend that the trial court erred in holding that Louisiana law governed the claims against VRNO. We will first explain the standards by which we determine which law to apply, and then we will apply those standards to the facts of this case.

### A. Governing Law

We need not decide which state's laws apply unless those laws conflict. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). The workers' compensation laws of both Texas and Louisiana contain exclusive remedy provisions that limit the claims available in wrongful death actions when the decedent was covered by workers' compensation. *See* Tex. Labor Code § 408.001(a)-(b); La. Rev. Stat. § 23:1032. Under the Texas statute,

> [r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or

4

employee of the employer for the death of or a work-related injury sustained by the employee [except for] the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.

Tex. Labor Code § 408.001(a)-(b). Under the Louisiana statute,

except for intentional acts . . . the rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, including but not limited to punitive or exemplary damages.

La. Rev. Stat. § 23:1032A(1)(a). The parties agree, as do we, that these laws conflict in that, as applied to today's case, the exception to the exclusive remedies provision of the Louisiana statute includes only liability resulting from an intentional act, whereas the exception to the exclusive remedies provision of the Texas statute permits the recovery of exemplary damages if an employee's death was caused by the employer's intentional conduct or by the employer's gross negligence. *See* Tex. Labor Code § 408.001(a)-(b); La. Rev. Stat. § 23:1032(A), (B).

The issue of which state's substantive law applies is a question of law for the court to decide. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). Thus, we review de novo the trial court's decision to apply Louisiana law. *See Mn. Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 70 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We note, however, that determining the contacts to be considered in resolving the legal question may entail issues of fact. *Sonat Expl.*, 271 S.W.3d at 231.

When there is a conflict of laws, Texas courts use the Restatement's "most

5

significant relationship" test to determine which law to apply. *See* Restatement (Second) of Conflict of Laws §§ 6, 145 (1971); *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000). Section 6 of the Restatement sets out the relevant general factors to consider when determining which law to apply.[1] Section 145 sets forth the factual matters to be considered when applying the principles of section 6 in a tort case. *Hughes Wood*, 18 S.W.3d at 205.[2]

The Texas Supreme Court has also instructed on numerous occasions that more specific Restatement provisions can apply in determining conflicts-of-laws issues in particular contexts. *See id.* at 206 n.2 (listing cases and contexts). In *Hughes Wood*, the court specifically stated that Restatement section 184 provides the standards by which a court is to determine immunity from a tort suit when an employee is covered by workers' compensation insurance. *Id.* at 205-06. That

---

[1] The general factors listed in section 6 include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

[2] The factual matters listed in section 145 include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2).

section provides:

> Recovery for tort or wrongful death will not be permitted in any state if the defendant is declared immune from such liability by the workmen's compensation statute of a state under which the defendant is required to provide insurance against the particular risk and under which
>
> (a) the plaintiff has obtained an award for the injury, or
>
> (b) the plaintiff could obtain an award for the injury, if this is the state (1) where the injury occurred, or (2) where the employment is principally located, or (3) where the employer supervised the employee's activities from a place of business in the state, or (4) whose local law governs the contract of employment under the rules of §§ 187–188 and 196.

Restatement (Second) of Conflict of Laws § 184.[3]

In *Hughes Wood*, the court considered, as we do here, whether the Texas or Louisiana workers' compensation exclusivity provision applied. In doing so, the court noted that "there is no policy reason to refuse to apply Louisiana's exclusive

---

[3] As the supreme court explained in *Hughes Wood*, section 184 applies the section 6 factors in the workers' compensation exclusive-remedy context. 18 S.W.3d at 206. Its application protects the parties' justified expectations because "[i]t is thought unfair that a person who is required to provide insurance against a risk under the workmen's compensation statute of one state which gives him immunity from liability for tort or wrongful death should not enjoy that immunity in a suit brought in other states." Restatement (Second) of Conflict of Laws § 184 cmt. b (1971).

Section 184 further appreciates the relative interests of other states in providing an exclusive workers' compensation remedy, because "to deny a person the immunity granted him by a workmen's compensation statute of a given state would frustrate the efforts of that state to restrict the costs of industrial accidents." *Id*. Moreover, "[a]ll states are sympathetic with the policies underlying workmen's compensation, and all states grant certain persons immunity from liability for tort or wrongful death . . . ." *Id*. Thus, applying section 184 (1) serves the needs of the interstate system, *see id*. § 6(2)(a); (2) applies the relevant policies of the forum, *see id*. § 6(2)(b); (3) promotes the basic policies underlying the workers' compensation system, *see id*. § 6(2)(c); (4) protects justified expectations, *see id*. § 6(2)(d); (5) facilitates certainty, predictability, and uniformity of result, *see id*. § 6(2)(f); and (6) eases the determination and application of the law to be applied, *see id*. § 6(2)(g). *Hughes Wood*, 18 S.W.3d at 206.

7

workers' compensation remedy." *Hughes Wood*, 18 S.W.3d at 207.[4]

## B. Application to the Facts

The key issues in this case for analysis under section 184 are (1) whether VRNO would have immunity under Louisiana law that it would not have under Texas law and (2) whether appellants have obtained or could obtain Louisiana workers' compensation benefits. *See id*. If VRNO has greater immunity under Louisiana law and appellants have received or could receive Louisiana benefits, under section 184, Louisiana law applies to the claims against VRNO. *See id*. We discuss each issue in turn and conclude that Louisiana law was properly applied in this case.

### 1. Immunity

Appellants do not dispute that given the facts of this case, VRNO would have immunity under Louisiana law that it would not have under Texas law. Louisiana provides that in addition to an injured worker's direct employer, a "statutory employer" also is immune from suit, except for liability resulting from an intentional act, when an injured worker is covered by workers' compensation insurance. *See* La. Rev. Stat. §§ 23:1032(A)(1)(a); 23:1061; *St. Angelo v. United Scaffolding, Inc./X-Serv., Inc.*, 40 So. 3d 365, 368-70 (La. App. 4 Cir. 2010); *Lopez v. U.S. Sprint Commc'ns Co.*, 973 So. 2d 819, 823-25 (La. App. 4th Cir. 2007); *see also Hughes Wood*, 18 S.W.3d at 207.[5] A party qualifies as a statutory employer,

---

[4] Appellants urge us to adopt their theory that if the employee was initially hired in the same state in which workers' compensation benefits are paid, that state's substantive law should always apply over the laws of the state where the injury occurred. We decline to adopt this theory in light of the supreme court's direction to apply Restatement section 184 in cases such as this.

[5] Appellants conceded in the trial court that Jason was covered by workers' compensation insurance in Louisiana and do not suggest otherwise on appeal. An insurance policy that appears to cover Jason in Louisiana appears several times in the record.

among other possibilities, if the party undertook "to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury . . . and contracts with any person for the execution thereof." La. Rev. Stat. §§ 23:1032(A)(2); *see also id*. § 23:1061(A)(1); *St. Angelo*, 40 So. 3d at 368-70. When a contract between the injured worker's direct employer and the party in question recognizes the existence of a statutory-employer relationship, it is presumed that the party is the worker's statutory employer. *See* La. Rev. Stat. § 23:1061(A)(3); *Johnson v. Motiva Enters. LLC*, 128 So. 3d 483, 489 (La. App. 5 Cir. 2013). This presumption can be rebutted by evidence that the work in question was "not an integral part of or essential to the ability of the principal to generate that individual principal's goods, products, or services." La. Rev. Stat. § 23:1061(A)(3); *see also Johnson*, 128 So. 3d at 489.

Here, the contract governing the turnaround between JVIC, Jason's direct employer, and VRNO expressly recognized a statutory-employer relationship. Appellants offered no evidence to rebut the presumption that this contract created. *See* La. Rev. Stat. § 23:1061(A)(3); *Johnson*, 128 So. 3d at 489. Accordingly, as Jason's statutory employer, VRNO possessed immunity under Louisiana law that it did not possess under Texas law. *See* La. Rev. Stat. §§ 23:1032(A)(1)(a); 23:1061; *St. Angelo, Inc.*, 40 So. 3d at 368-70; *Lopez*, 973 So. 2d at 823-25.

### 2. Louisiana benefits

We next turn to the question of whether appellants have obtained or could obtain Louisiana workers' compensation benefits. *See Hughes Wood*, 18 S.W.3d at 207; Restatement (Second) of Conflict of Laws § 184(b). It is undisputed that appellants have only received benefits under the Texas workers' compensation system and have not sought benefits under the Louisiana system. The fact that out-of-state benefits are being received, however, is not a bar to the receipt of benefits

9

under the Louisiana system. *See* La. Rev. Stat. §§ 23:1035.1(2). The out-of-state benefits simply act as a credit against any Louisiana benefits. *Id.* § 23:1035.1(2)(c).

Appellants instead assert that they could not now obtain benefits in Louisiana because any such claim would be barred under Louisiana Revised Statutes section 23:1209(A)(1) as more than a year has passed since Jason's death without a claim being filed in Louisiana. Section 1209(A)(a) specifically provides that

> (1) [i]n case of personal injury, including death resulting therefrom, all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter, or unless within one year after the accident a formal claim has been filed . . . .

La. Rev. Stat. §§ 23:1209(A)(l).

As VRNO points out, however, prescription under section 1209(A)(1) may be interrupted in certain circumstances. One such tolling provision is set forth in section 1209(A)(2), which provides that "[w]here such payments have been made . . . , the limitation shall not take effect until the expiration of one year from the time of making the last payment . . . ." Louisiana courts have interpreted this provision as encompassing workers' compensation payments made through another state's system. *See Lentz v. N. Am. Van Lines, Inc.*, 582 So. 2d 984, 986 (La. App. 1 Cir. 1991); *Ryder v. Ins. Co. of N. Am.*, 282 So. 2d 771, 774–75 (La. App. 3 Cir. 1973); *cf. Chance v. Fid. & Cas. Co. of N.Y.*, 509 So. 2d 593, 599–600 (La. App. 3 Cir. 1987) (holding that payments under federal compensation system interrupted prescription under section 1209(A)(1)). It is established and undisputed in this case that payments to appellants under the Texas system are ongoing; thus, the prescription of the claim for Louisiana benefits is interrupted. *See Lentz*, 582 So.

2d at 986; *Chance*, 509 So. 2d at 599–600; *Ryder*, 282 So. 2d at 774–75.[6] Appellants do not make any other arguments about whether they could still obtain Louisiana benefits.

### 3. Conclusion

Because appellants could still obtain Louisiana benefits and VRNO has greater immunity under Louisiana law than Texas law, Restatement section 184 dictates that Louisiana law applies to the claims against VRNO. *See Hughes Wood*, 18 S.W.3d at 207; Restatement (Second) of Conflict of Laws § 184. Accordingly, the trial court did not err in applying Louisiana law to those claims and we overrule appellants' first issue.

## II. Expert Testimony on Intent

In their second issue, appellants contend that the trial court erred in refusing to permit one of their experts, Dr. John McManus, to testify as to whether certain conduct of VRNO personnel was intentional. McManus, one of several experts to

---

[6] It should be noted that it is something of an open question in Louisiana law as to whether out-of-state payments made by or on behalf of a direct employer would also serve to interrupt prescription on claims involving a statutory employer. Although we found no Louisiana case considering this exact issue, it would appear that the interruption of prescription due to out-of-state payments would encompass both the direct employer and the statutory employer because under Louisiana law the liability of the two employers is considered solidary. *See, e.g.*, *Stewart v. Boh Bros. Const. Co.*, 128 So. 3d 398, 402 (La. App. 5 Cir. 2003); *Isaac v. Lathan*, 836 So. 2d 191, 194–95 (La. App. 1 Cir. 2002); *see also Glasgow v. PAR Minerals Corp.*, 70 So. 3d 765, 769-70 (La. 2011) (explaining that when prescription is interrupted for one solidary obligor, it is interrupted for all solidary obligors).

In its appellate briefing, VRNO also identifies a second ground for holding that prescription was interrupted under the facts of this case: in Louisiana, the timely filing of a tort action against an employer in a court of competent jurisdiction interrupts prescription on a workers' compensation claim based on the same occurrence. *See, e.g.*, *Torres v. La. Shrimp & Packing Co.*, 32 So. 3d 803, 803 (La. 2010); *Isaac v. Lathan*, 836 So. 2d 191, 194–95 (La. App. 1 Cir. 2002). The present lawsuit was clearly timely filed against VRNO as it was filed less than a year after Jason's injury and death; however, because VRNO did not raise this ground in the trial court, we will not consider this ground on appeal.

testify for appellants, was presented as an expert in emergency medicine. He testified at length regarding the proper protocols, diagnosis, and treatment of heatstroke as well as the conditions first-responders encountered at the refinery and the perceived failings of VRNO personnel in responding to the emergency. McManus was quite critical of the St. Charles Refinery's emergency system and protocols and of the decisions made and treatment undertaken. Among other critiques, he concluded that there was no justifiable explanation as to why VRNO personnel did not timely and effectively lower Jason's body temperature or why there was a delay in calling 911. McManus further stated that by the time VRNO got Jason transferred to a St. Charles Parish ambulance, it was substantially certain that he was going to die because they had not sufficiently lowered his temperature.

Prior to trial, VRNO filed a motion to exclude testimony from McManus regarding intent. As mentioned in the motion, McManus discussed VRNO employees' intent several times in his expert report.[7] Although the trial court denied this motion after a brief hearing, VRNO urged the court to reconsider the

---

[7] Among McManus's statements in his report about intent were the following:

The circulatory status was intentionally not documented or fully assessed according to medical statements. . . . The intentional choice not to treat Mr. Wellons during the "golden hour" time period made it substantially certain that he would suffer morbidity and/or mortality. . . . There was deliberate absence of medical equipment immediately available to assess, monitor and treat Mr. Wellons. . . . During the medical extrication and treatment by the ERT for Mr. Wellons there was intentionally no organized medical communication and treatment. There was intentionally no communication or coordination between the nurse on the ground and the medical personnel during the extrication on treatment or possible transportation to nearest hospital. . . . Once the patient was extricated, there was intentionally no continuous cooling performed while awaiting 911 EMS. There was a deliberate lack of documented medical treatment provided other than legal statements for this case. Although the initial medical response by the ERT was swift, there was intentionally absence of a clear treatment plan during extrication and while awaiting transport. The deliberate absence of prehospital communication and medical treatment resulted in certain mortality for this patient.

ruling shortly before McManus testified during trial. In a conference held outside the jury's presence, the trial court reconsidered its earlier ruling and held that McManus would not be "allowed to testify to what was the subjective intent of Valero and its employees." The court further expounded, "I don't think that he's entitled to do that unless he has some evidence that they made statements or did other things that would lead him as a professional to conclude that they had a specific intent."[8]

A witness "qualified as an expert by knowledge, skill, experience, training, or education" may present opinion testimony if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Tex. R. Evid. 702; *see also KMart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999). For expert testimony to be admissible, the proponent of the testimony must establish that the expert is qualified and that his testimony is relevant and based upon a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). A trial court has broad discretion in deciding whether to admit expert testimony, and its decision will not be disturbed on appeal absent an abuse of discretion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006).

Under Texas Rule of Evidence 103, a party complaining of the exclusion of evidence must inform the trial court of the substance of the excluded evidence by an offer of proof, unless the substance was apparent from the context. Tex. R. Evid. 103(a)(2); *In re N.R.C.*, 94 S.W.3d 799, 806 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). During the conference on McManus's testimony,

---

[8] VRNO's motion also sought to prevent McManus from testifying about Jason's cause of death or the question of timing as it related to the cause of death. The trial court denied these portions of the motion and did not reconsider them during trial.

13

although appellants' counsel argued McManus should be allowed to testify regarding intent, counsel did not provide any specifics regarding McManus's proposed testimony, not whose intent he planned to testify to or how the testimony would aid the jury. Near the end of the conference, appellants' counsel stated his intention to make a bill of exception or offer of proof with McManus, to which the judge replied, "Absolutely. No problem." It does not appear, however, that any such bill or offer was made. Later, during appellants' counsel's examination of McManus, the following exchange occurred:

Q. [D]oes their policy and procedure say that EMS should be called immediately and there should be a transport?

A. Yes.

Q. And so with regard to both Charles Adams and Nurse Rulapaugh saying they wanted to wait until Jason Wellons got on the ground before they did their evaluation to call 911, what is your evaluation of that?

A. That would be a [sic] intentional delay and it resulted in the death of Mr. Wellons.

VRNO's counsel: Excuse me. Judge, object to this witness giving opinions on intent of the Valero people.

THE COURT: Okay. That's sustained.

Appellants' counsel: We can restrain. [sic]

VRNO's counsel: Can we instruct the jury?

THE COURT: Instruct the jury . . . to disregard the witness'[s] characterization.

Q. Okay. So let's just say this:

Can you think of any reason whatsoever to wait until Jason Wellons hit the ground if he has shown signs of heatstroke when he's up in the rack?

14

A. I cannot. And they—that would be a violation of their own protocol.

In their briefing to this court, appellants point to this exchange as "[a]n example of the type of testimony that would have been offered." We presume without deciding that appellants have preserved this issue for our review. *See* Tex. R. Evid. 103(a)(2); *In re N.R.C.*, 94 S.W.3d at 806.

Appellants argue at length that experts are allowed to testify as to ultimate issues of fact. While this is true under appropriate circumstances, *see, e.g.*, *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) ("Otherwise admissible opinion testimony is not objectionable because it embraces an ultimate issue of fact."), the proponent of such evidence is still required to show that such expert testimony is necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702; *see also Honeycutt*, 24 S.W.3d at 360; *Bruce*, 998 S.W.2d at 620.

When the jury is equally competent to form an opinion about an ultimate fact issue or an expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony. *Honeycutt*, 24 S.W.3d at 360. In other words, if the issue involves only general knowledge and experience rather than expertise, it is within the province of the jury to decide. *See Bruce*, 998 S.W.2d at 620.

Appellants do not offer any explanation in their briefing as to why the jury needed McManus to tell them that the VRNO employees wanting to wait until Jason was brought down from the pipe rack to evaluate him and decide whether to call 911 was intentional. Appellants likewise do not explain why the jury needed McManus's expert opinion on any other matter of subjective intent.[9] The trial court

---

[9] See, for example, the statements regarding intent in McManus's expert report. *See* n.8

15

could have reasonably concluded that the question of whether the actions and inactions in question were intentional was not so complex as to require expert testimony to help jurors draw their own conclusions. *See, e.g.*, *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 310 (Tex. App.—Houston [14th Dist.] 2000, no pet.) As discussed above, McManus gave a full-throated critique of VRNO's policies and protocols at the St. Charles Refinery as well as of the actions VRNO personnel took and failed to take. Appellants have not established that the trial court abused its discretion in refusing to permit McManus to testify regarding the subjective intent of VRNO or its employees. *See Honeycutt*, 24 S.W.3d at 360-61 (holding testimony of human factors and safety expert was not necessary to help the jury determine whether conditions at store created an unreasonable risk of injury). Accordingly, we overrule appellants' second issue.

### III. Closing Argument

In their third issue, appellants assert that VRNO's counsel made improper and incurable statements to the jury during closing arguments. Specifically, appellants complain that VRNO's counsel suggested in his argument that appellants were asserting and had to prove that VRNO personnel intended to kill or murder Jason in order to be successful on their claims. As will be discussed below, appellants really make two different complaints under this issue—a complaint about the references to an intent to kill, which was not preserved by an objection, and a complaint about a reference to murder, which arguably was preserved by objection.

A litigant is entitled to have his counsel argue the facts of the case to the jury. *Zurita v. Lombana*, 322 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.]

*supra*.

16

2010, pet. denied). Trial counsel may properly discuss the reasonableness of the evidence as well as the probative effect, or lack thereof, of the evidence. *Id*. Counsel should be allowed wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury. *Id*. at 483. Control over counsel during closing argument is within the sound discretion of the trial court and will not be disturbed absent clear abuse of that discretion. *Duke v. Jack in the Box E. Div., L.P.*, No. 14-15-00798-CV, 2017 WL 2561245, at *2 (Tex. App.—Houston [14th Dist.] June 13, 2017, pet. denied) (mem. op.).

### A. Counsel's Remarks

To understand VRNO's counsel's closing remarks, we must first recall that Question no. 1 in the jury charge asked whether the intentional conduct of VRNO proximately caused Jason's death, and the accompanying two-part definition defined "intentional conduct" as meaning "that one or more [VRNO] employee either (1) consciously desired the physical result of his actions or (2) knew that the result is substantially certain to follow from his actions." In his remarks, defense counsel stated generally that appellants' claim was that VRNO "intentionally caused [Jason's] death," "intentionally killed" Jason, and were "trying to kill" Jason, but counsel insisted, contrary to that claim, VRNO personnel were actively trying to help Jason, not kill him.

In specifically discussing the first part of the charge definition of intentional conduct— "consciously desired the physical result of his actions"—counsel likened the requirement to the Texas penal statute for murder, stating that it required evidence that a VRNO employee consciously wanted to cause Jason's death. At this point, appellants' counsel stated his first and only objection to this line of argument. Appellants' counsel, however, did not state the complete grounds for his objection before the judge overruled the objection and instructed him to sit

17

down. Counsel stated: "Excuse me, Your Honor. [H]e's arguing the murder that's—."[10] This was also VRNO's counsel's only use of the word "murder" in his argument.

In discussing the second part of the definition— "knew that the result is substantially certain to follow from his actions"—VRNO's counsel acknowledged that this was the section on which appellants were relying. He also emphasized the high bar set by the requirement of substantial certainty and urged the jury to confine its consideration to the time period after Jason's injury became known.

In his closing remarks, appellants' counsel reiterated that appellants were not claiming any VRNO personnel "consciously desired the physical result," i.e., Jason's death, but they knew untreated heatstroke is deadly and yet failed to timely and properly treat Jason. Appellants' counsel also insisted that VRNO failed to follow its own procedures and that bad company policies and inadequate training and supervision equaled intent as defined in the second part of the definition. In direct response to defense counsel's argument, appellants' counsel stated, "don't think because we didn't prove they murdered him, that we didn't prove that it was substantially certain" that VRNO personnel's inaction would lead to Jason's death.

### B. References to Intent to Kill

We begin our analysis with appellants' complaint about VRNO's counsel's references to an intent to kill. Appellants state that VRNO's counsel asserted appellants claimed and had to prove VRNO personnel possessed an intent to kill Jason in order for appellants to be successful in the lawsuit. As set forth above, VRNO's counsel did make several references to an intent to kill, but at no point did appellants object to those references. If the probable harm from an improper

---

[10] The judge had also earlier instructed VRNO's counsel to sit down when he had made an objection during appellants' counsel's closing remarks.

jury argument is curable, then the error must be preserved by obtaining an adverse ruling on a timely objection, motion to instruct the jury, or motion for mistrial. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam); *DeWolf v. Kohler*, 452 S.W.3d 373, 396 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Only when argument is deemed so prejudicial and inflammatory that its impact would not be curable by an instruction to disregard by the trial court is no objection necessary. *Clark v. Bres*, 217 S.W.3d 501, 509 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). And even then, the complaint at least must be raised in a motion for new trial, as appellants did here. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *Clark*, 217 S.W.3d at 509 n.1.

In order to show that VRNO's counsel made an incurable argument, appellants must prove: (1) an improper argument was made; (2) it was not invited or provoked; (3) it was not curable by a prompt withdrawal of the statement by counsel or a reprimand or instruction by the trial court; and (4) by its nature, degree, and extent, the argument constituted harmful error based on an examination of the entire record to determine the argument's probable effect on a material finding. *Clark*, 217 S.W.3d at 509. The duration of the argument, whether it was repeated or abandoned, and whether there was cumulative error are factors for consideration. *Id*. Appellants must also show that the probability the improper argument caused harm is greater than the probability the verdict was grounded on proper proceedings and evidence. *Id*. Instances of truly incurable jury argument are rare. *Phillips*, 288 S.W.3d at 883. Appellants must demonstrate that "the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id*. (quoting *Goforth v. Alvey*, 153 Tex. 449, 271 S.W.2d 404, 404 (1954)).

19

As stated above, VRNO's counsel's remarks must be viewed in light of the definition of "intentional conduct" provided in the charge as meaning a VRNO employee either "consciously desired the physical result of his actions" or "knew that the result [wa]s substantially certain to follow from his actions." In this light, it is clear that counsel's remarks regarding an intent to kill were either a shorthand way to refer to the fact that appellants had to prove "intentional conduct" that resulted in Jason's death or referenced the first part of the charge definition— "consciously desired the physical result of his actions." It appears from context that, at different points, defense counsel meant the remarks in each of these ways. Regardless, VRNO's counsel also made it clear that he understood that appellants were not basing their claim on the first part of the definition but instead were basing their claim on the second part— "knew that the result [wa]s substantially certain to follow from his actions." While VRNO's counsel suggested that to be successful under the first part of the definition, appellants would have to prove an intent to kill, he made a different argument in regards to the second part of the definition, emphasizing the high level of proof required to show substantial certainty and urging the jury to confine its consideration to the time period after Jason's injury became known. Appellants' trial counsel reiterated this dichotomy in his own remarks to the jury, explaining that they were not seeking a finding under the first part and thus did not have to prove an intent to kill.

Considering the entirety of the closing arguments and the record as a whole, VRNO's counsel's references to an intent to kill was not "so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips*, 288 S.W.3d at 883. The probability that the improper jury argument caused harm is not greater than the probability that the verdict was grounded on

proper proceedings and evidence. *See Clark*, 217 S.W.3d at 509. Even assuming the argument was improper, it was not incurable in nature.

### C. Reference to Murder

As explained above, the only reference VRNO's counsel made to murder came when he stated that the first part of the court's "intentional conduct" definition was "similar to the Texas statute on murder" in that it required a VRNO employee to consciously desire Jason's death. Even assuming that appellants' counsel objected sufficiently to this argument and such argument was improper, based on the entire record of this case, we cannot say the argument, either alone or in combination with the other complained-of argument, probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a) (providing that no judgment may be reversed for error unless the error probably caused the rendition of an improper judgment or prevented the proper presentation of the case to the court of appeals); *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex. 1979) (explaining that complainant must show that the probability an improper argument caused harm is greater than the probability that the verdict was grounded on proper proceedings and evidence); *Dallas Cty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 48 (Tex. App.—Dallas 2012, pet. denied) (holding arguments, although improper, did not either alone or in combination with other arguments probably cause the rendition of an improper judgment.). Counsel's comment was a clear attempt to explain the first part of the charge definition of "intentional conduct," the part that both VRNO's counsel and appellants' counsel agreed was inapplicable to the case. In the absence of demonstrable harm from any of the closing remarks appellants complain about, we overrule appellants' third issue.

21

***Conclusion***

Finding no merit in any of appellants' issues, we affirm the trial court's judgment.

/s/    Frances Bourliot
Justice

Panel consists of Chief Justice Frost and Justices Christopher and Bourliot.